**Thomas I. FITZGERALD, Public Administrator of New York County, Administrator of the Estate of William J. Graser, deceased, Plaintiff-Appellant,**

v.

**A. L. BURBANK & CO., Ltd. and Tankers and Tramps Corp., Defendants-Appellees.**

**No. 33, Docket 35079.**

United States Court of Appeals, Second Circuit.

Argued Sept. 16, 1971.

Decided Nov. 12, 1971.

Kenneth Heller, New York City, for plaintiff-appellant.

William M. Kimball, New York City (Burlingham, Underwood, Wright, White & Lord, New York City, on the brief), for defendants-appellees.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

On July 26, 1963 the decedent William J. Graser was hired as a marine engineer by A. L. Burbank & Co., Ltd. (Burbank) in New York City as agent for Tankers and Tramps Corporation, the alleged owner of the SS ATLAS, and he was immediately sent to join the vessel, which was off Bahrain Island in the Persian Gulf. Graser reached the ATLAS late on the evening of July 28th and the next morning he began work "blowing down" the boilers in the ship's engine room. After spending less than an hour at this task, in extremely hot temperatures, Graser collapsed and had to be helped to his quarters. He was seen on the ship by a doctor in the early afternoon and was admitted to a Bahrain hospital that evening. Graser died on August 1, 1963 from heat exhaustion and pneumonia.

The plaintiff brought this action under the Jones Act, 46 U.S.C.A. § 688 as personal representative of the decedent. The jury returned a verdict in favor of the defendant Tankers and Tramps.[1] Judgment dismissing the complaint was entered, following the verdict; a motion for a new trial was denied, and the plaintiff has appealed from the judgment and the denial of the motion.

---

1. Although the action was originally against Tankers and Tramps and Burbank, the latter was conceded to be merely an agent. In the course of the trial a motion to dismiss as to Burbank was granted without objection, therefore on appeal the defendant Tankers and Tramps is the sole appellee.

In his complaint the plaintiff charged the defendant with a number of counts of negligence, including improper maintenance of the ATLAS and improper care for Graser both before and after he became ill. In view of the disposition of the case on this appeal, however, it is unnecessary to delineate these negligence claims more fully, except for the claim of negligent care by the doctors, discussed *infra*.

The plaintiff's chief claim of error on appeal concerns the court's charge to the jury on the issue of employment. Because only a seaman's employer can be held liable under the Jones Act, the threshold question for the trier in this case was whether or not Tankers and Tramps was Graser's employer.[2] In response to an interrogatory, the jury found that it was not.[3]

The plaintiff's evidence on the issue of employment consisted primarily of the charter party between Tankers and Tramps and the United States govern-ment, the agency agreement between Tankers and Tramps and Burbank, and a letter from the Social Security Administration. The defendant relied chiefly on the oral testimony of Paul Caramella, an officer of Burbank,[4] which, on this issue, did not materially contradict the evidence presented by the plaintiff.

The charter party was entered into on August 16, 1961, by the Government as charterer and Tankers and Tramps as owner, and was extended on November 1, 1962, to continue until January of 1964. It was solely concerned with the ATLAS and was in all respects a typical time or voyage charter party. The agency agreement in effect during July, 1963, was entered into on April 1, 1963, between Tankers and Tramps, as owner, and Burbank, as agent, and was approved by the United States Maritime Commission on behalf of the Government. The letter from the Social Security Administration showed that William Graser had reported earnings during 1963 from Tankers and Tramps in care of Burbank.

2. In the normal case, the shipowner is the employer, see G. Gilmore & C. Black, The Law of Admiralty, § 6–21, at 285 (1957).

3. Our decision to reverse on the basis of an improper charge relieves us from the task of deciding whether or not a new trial should be granted because the verdict indicated that the jury had not followed the court's instructions, see, *e. g.*, United Press Ass'n v. National Newspapers Ass'n, 254 F. 284 (8 Cir. 1918), 6A J. Moore, Federal Practice ¶ 59.08[4], at 3803 (2d ed. 1966).

From the evidence and the charge, it would have been impossible to find that the employer was anyone except the Government or Tankers and Tramps. However, the jury returned the verdict as follows:

"THE CLERK: What is your verdict?
"THE FOREMAN: In favor of the defendant.
"THE COURT: Whom did you find to be the employer?
"THE FOREMAN: The last known carrier was Atlantic Carriers.
"THE COURT: Well, the issue that I asked you to decide was whether the Tankers & Tramps was the employer. Did you decide yes or no?
"THE FOREMAN: No.

"THE COURT: You decided no?
"THE FOREMAN: Right."

From the evidence submitted, it is understandable that the jury might have become confused and have thought that Atlantic Carriers, a previous employer of Graser's, was his employer at the time of death. It is clear, however, that the jury improperly decided the issue as between Tankers and Tramps and the Government.

4. The defendant also puts some weight on the testimony of Robert G. Murphy, Chief Engineer on the ATLAS during the time in question. When asked who his employer was in July of 1963, Murphy responded: "The Kulukundis interests, and in July, I believe the vessel was then operated by A. L. Burbank & Company, as agents for the Government."

In light of Murphy's rather indefinite answer and the fact that there is no reason to believe that he would know for whom Burbank was agent, we find this testimony to be of scant value on the employment issue, see Bohannon v. American Petroleum Transport Corp., 86 F.Supp. 1003, 1005 (S.D.N.Y.1949). As the judge in that case said, the Supreme Court "would not predicate liability on the basis of who the seaman believed was his employer."

Caramella's testimony covered a number of the features of the arrangement between Burbank, Tankers and Tramps, and the Government. During the time in question, the ATLAS was chartered to the Government under consecutive voyage charter which provided among other things that the Government could decide where the ship would go and what cargo it would carry. The Government was also the guarantor of the mortgage on the ATLAS, although it did not hold the mortgage itself. *See* 46 U.S.C.A. §§ 1271–1279. Caramella did not know whether or not the mortgage was in default during the period in question, but in 1965 or 1966 the Government paid the mortgage and took possession of the ship.

He also testified that the freight money due under the charter was paid by the Government to Burbank, which was authorized to expend it solely for the purpose of paying operating expenses, and all of the freight money was consumed in this way. He further stated that Burbank hired the crew under the agency agreement and made regular accountings to the Government and to Tankers and Tramps.

Although Burbank did the actual hiring of the crew, it was agreed by all parties that it acted only as agent and was not the employer for Jones Act purposes. The central question became, then, for whom was Burbank agent? The agency agreement is a highly important piece of evidence as it established the prima facie fact that Burbank was agent for the owner Tankers and Tramps. Although there was evidence that the Government had to approve the agency agreement, there is no indication whatsoever in the agreement that Burbank was acting for or on behalf of the Government.

The agreement, made between Burbank as agent and Tankers and Tramps as owner, was Burbank's standard form of general agency contract. It provided that Burbank was to maintain the AT-LAS "in such lawful trade and service as the owner shall direct" and it was to perform all necessary services "for the account of the owner," including the signing on and off of crews, paying wages, furnishing supplies for the vessel, and arranging for shipyard overhaul. Burbank was also to procure a master for the ATLAS who would be the employee of Tankers and Tramps and who would have full control and responsibility over the navigation and management of the vessel and its crew; and it had the duty to collect freight revenues and pay operating expenses.

The only mention of the Government in the agreement is a reference to the Maritime Administration which, along with Tankers and Tramps and Burbank, approved the contract. In the absence of strong countervailing evidence, then, this agency agreement shows that Burbank was agent solely for Tankers and Tramps.[5] The mere approval by the Government does not change that fact.

The other important document was the charter party between Tankers and Tramps and the Government. This contract, captioned "Tanker Voyage Charter Party," was on a standard government form. Its terms show quite plainly that Tankers and Tramps, as the owner, had not relinquished exclusive possession, command, and navigation of the ATLAS.

Tankers and Tramps was to man, equip and supply the vessel for and during its voyages and to appoint agents at all ports. It was responsible for towing and pilotage charges. It was entitled to limitation of liability and any salvage was for its sole benefit. The ATLAS was permitted to carry cargo for the account of parties other than the Government; and the Government was required to pay freight according to cargo carried and was subject to demurrage charges —items quite foreign to a demise or bareboat charter.

The Government was, however, entitled to name the ports of call, issue routing

---

5. Burbank also thought that it was agent for Tankers and Tramps, as it reported Graser's Social Security deductions in that fashion.

instructions, and decide the manner and places in which the vessel would load and unload. All of these are normal prerogatives of a time or voyage charterer.

In its case in chief the plaintiff had, therefore, presented substantial proof that Burbank was the agent of Tankers and Tramps as owner of the ATLAS and that the Government was not the owner of the vessel. To meet this, it was necessary for the defendant to produce persuasive evidence to the contrary, *i. e.,* that Tankers and Tramps was not really the owner but only a representative of the Government. This it did not do. Instead, however, it offered two theories about the practically undisputed facts which, it asserts, lead to the conclusion as a matter of law, that the Government was the owner of the ATLAS.

■ The first theory was that the United States as charterer of the ATLAS had become the owner *pro hac vice.* It is true that the law of admiralty has long recognized that in some situations a charterer of a vessel will be treated as the owner and called the owner *pro hac vice,* Reed v. The Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). A charter giving rise to such an effect is generally known as a demise or bareboat charter.

■ The test for deciding whether or not a charter is a demise was set out by the Court in Guzman v. Pichirilo, 369 U.S. 698, 699–700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962).

"To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee. * * * It is therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all," *see also* United States v. Shea, 152 U.S. 178, 190, 14 S.Ct. 519, 38 L.Ed. 403 (1894), Reed v. United States, 78 U.S. (11 Wall.) 591, 600–601, 20 L.Ed. 220 (1871).

■ Furthermore, as Judge Learned Hand said in Hansen v. E. I. DuPont de Nemours & Co., 33 F.2d 94, 96 (2 Cir.), cert. denied, 280 U.S. 589, 50 S.Ct. 37, 74 L.Ed. 638 (1929), "We start * * * with the general presumption that the owner does not mean to put his vessels into the possession of the charterer." Therefore, the party attempting to show that the owner of the vessel has been relieved of the legal obligations flowing to him as owner must bear the heavy burden of establishing the facts which prove his point, *Guzman, supra,* 369 U.S. at 700, 82 S.Ct. at 1096.

■ If the owner is responsible for keeping the vessel in good condition during the life of the charter, Leary v. United States, 81 U.S. (14 Wall.) 607, 612, 20 L.Ed. 756 (1872), or if the owner supplies the master and crew, Reed v. The Yaka, *supra,* it is extremely unlikely that there has been a demise to the charterer. Furthermore, the mere fact that the charterer has some control over the master, Travis v. Poseidon Lines, 203 F.Supp. 129, 130 (N.D.Ill., 1962), or that the charterer selects the routes to be taken or the cargo to be carried does not make him the owner *pro hac vice.*

■ Therefore, in order for the defendant to prevail in the present case, it must establish facts proving that the Government was in complete and exclusive possession, command, and navigation of the ATLAS. Any proof less than that makes Tankers and Tramps liable as the employer. The evidence in this case is insufficient, as a matter of law, to support the conclusion that the Government was the owner of the vessel *pro hac vice.*

The defendant's second theory that Tankers and Tramps was not the employer is somehow based on the fact that the Government was guarantor of the mortgage on the ATLAS. The defendant has cited no cases in support of its position, nor have we been able to discover any.

It is well established that a mortgagee is rarely, if ever, liable for the acts of the master or other agent of a ship, Amer. Car & Foundry Co. v. Brassert, 289 U.S. 261, 264, 53 S.Ct. 618, 77 L.Ed. 1162 (1933), nor is he liable for supplies and repairs to the ship, Morgan's Assignees v. Shinn, 82 U.S. (15 Wall.) 105, 21 L.Ed. 87 (1872); The Boise Penrose, 22 F.2d 919 (2 Cir. 1927); see also The John E. Berwind, 56 F.2d 13, 15 (2 Cir. 1932). Therefore, it is even less likely that the guarantor of a mortgage will be liable rather than the owner who has the equity in the vessel.

The facts of the *Shinn* case, *supra*, are worth mentioning. The issue there was whether or not Shinn was the owner of a vessel so as to make him liable for repairs to it. Shinn had made a loan to one Kelly and had received in return a bill of sale of the vessel. Shinn recorded the bill of sale and registered the ship in his name, insured the vessel and possessed a power of attorney to take all monies earned by the ship and due to Kelly. On the facts of the case, however, the Court held that Shinn was in actuality never more than a mortgagee. As such he would not be entitled to any freight earned by the ship nor receive any benefit from the repairs to it, and therefore, he was not liable for the repairs.

 In order for any mortgagee, guarantor of a mortgage, or any similar encumbrancer, not the holder of an equitable title, to be held to be the employer for Jones Act purposes, he must exercise exclusive actual control over the vessel's operations. That is, either he or his agent must be in charge of the myriad details of operating the vessel, such as engaging the master, hiring the crew, and furnishing the fuel, food and supplies, see *Brassert, supra*; The G. W. Glenn, 4 F.Supp. 727, 731 (D.Del.1933). Because it is so unlikely that any mortgagee will have such control, the burden of proving it is on the one who asserts it. In the present case, in order for Tankers and Tramps to escape liability as the Jones Act employer, it must bear the burden of showing that the United States, as guarantor of the mortgage, exercised exclusive actual control over the operations of the ATLAS.

█ In the light of the foregoing summary of the evidence, the claims of the plaintiff-appellant and of the defendant-appellee, and the discussion of the applicable legal principles, we now turn to the trial court's charge on the vital issue of the case which was whether or not Tankers and Tramps was the decedent's employer for Jones Act purposes. In pertinent part the court instructed the jury as follows:

"In this case, the very first problem that you must resolve is whether the defendant, Tankers & Tramps, was Graser's employer, and this is so because a seaman, under the Federal law, or his estate if he died, is given the right to sue only his employer."

\* \* \* \* \* \*

"Accordingly, the first issue of fact that you are called upon to resolve is whether the plaintiff has persuaded you by a preponderance of the credible evidence that Tankers & Tramps was Graser's employer. The solution of the problem of determining the employer depends upon determining whose enterprise the operation of the vessel was.

Such words as 'employer' and 'agent' are not decisive. No single phrase can be said to determine the employer. One must look at the venture as a whole. Whose orders controlled the master and the crew? Whose money paid their wages? Who hired the crew? Whose initiative and judgment chose the routes and the ports of call?

If you decide that Tankers & Tramps was not Mr. Graser's employer, that is the end of the case, and you are duty bound to report a verdict, through your foreman, in favor of the defendant."

The test which the court gave the jury for determining the employer was taken almost verbatim from the Court's opin-

ion in Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 795, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949). The plaintiff objected to the proposed charge both before and after it was given on the ground that it did not apply to this fact situation. We agree.

The issue in *Cosmopolitan* was whether a general agent employed by the United States or the United States was the employer for Jones Act purposes. The Court, applying its test to the war-time standard form agency agreement, found that the United States was the employer. That case, however, is a far cry from the present one. Here the issue is not between agent and owner but between charterer-guarantor of mortgage and owner. The test to be applied must, of necessity, be a quite different one. While questions as "whose money paid the crew's wages" and "whose initiative and judgment chose the routes and the ports of call" are pertinent and appropriate for resolving the issue presented in *Cosmopolitan*, they are misleading as applied to the facts in this case.

The evidence presented here showed that the Government, as charterer, paid freight money to Burbank which paid the seamen's wages out of it. While such a scheme was perfectly compatible with Tankers and Tramps as owner and employer, the instructions given the jury would encourage that body to construe the wage payments and other operational expenditures directly out of the freight money as strong evidence that the Government was the employer. The evidence also showed that the Government selected the routes and the ports of call. Again, however, even though these were customary provisions of a time or voyage charter, the charge treated them as important evidence that the Government was the employer. Therefore, of the four test questions propounded in the charge, at least two of them were misleading and prejudicial to the plaintiff.

Moreover, assuming *arguendo* that there was sufficient evidence to submit to the jury, there were no instructions on the generally accepted test, set out above, for determining whether or not a charterer is the owner *pro hac vice* nor was there mention of a test to be used for the defendant's theory that a guarantor of the mortgage becomes the employer. The court also placed the burden on the plaintiff to show that Tankers and Tramps was the employer. As previously stated, however, once the plaintiff produced evidence to show, *prima facie*, that Tankers and Tramps was the owner of the ATLAS, the burden was on that defendant to show that this did not make it the employer for Jones Act purposes. The charge was erroneous and misled the jury as to the applicable principles of law, Norfleet v. Isthmian Lines, Inc., 355 F.2d 359, 362–363 (2 Cir. 1966), on a vital element in the plaintiff's case, *cf*. Delima v. Trinidad Corp., 302 F.2d 585, 587 (2 Cir. 1962), and the judgment below must be reversed, *cf*. Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 398–400, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960).

In any subsequent trial of this case, unless there is additional evidence presented that the Government was owner *pro hac vice* or exercised actual exclusive control over the vessel's operations as guarantor of the mortgage, the court must charge that Tankers and Tramps was the employer for Jones Act purposes.

Of course, in ordinary cases under both the Federal Employer's Liability Act, 45 U.S.C.A. § 51 et seq. and the Jones Act, the jury is to decide the factual question of employment, when there is conflicting evidence on the issue, Baker v. Texas & P. R. Co., 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756 (1959), but this does not mean that the jury is to be permitted to determine the employment issue when there is but one reasonable conclusion to be drawn from all the evidence, Brady v. Southern Ry. Co., 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239 (1943); Galloway v. United States, 319 U.S. 372, 395–396, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943).

The Court in *Galloway, supra,* at 395, 63 S.Ct. 1077, stressed the fact that what

constitutes sufficient evidence on an issue to send it to the jury must be decided in each case on the basis of the specific situation presented, *see also,* IX Wigmore, Evidence, § 2494, at 296 (3rd ed. 1940). The essential requirement is simply that the jury should not be allowed to speculate in the absence of probative facts.

 The employment issue here presents two reasons for the court to exercise extreme care in deciding whether or not to submit it to the jury. For one thing, it is a problem in admiralty law and throughout the centuries special courts have been called upon to exercise their expertise in this area. Nautical terms and concepts, such as charter parties, are not familiar to most jurymen, *see generally* G. Gilmore & C. Black, The Law of Admiralty, §§ 1–1 to 1–8, at 1–18 (1957). Therefore, even if the district court is not "officially" sitting in admiralty, it is a wise practice in these types of cases to take issues from the jury and avoid the possibility of jury speculation whenever it appears that only one reasonable conclusion can be reached on the evidence. We have approved such a course in other Jones Act cases, see *e. g.,* Schiemann v. Grace Line, Inc., 269 F.2d 596 (2 Cir. 1959); Bergan v. International Freighting Corp., 254 F.2d 231, 233 (2 Cir. 1958).

The second reason which supports the advisability of such a procedure in the present case is that the issue primarily involves the construction of written documents—the charter party and the agency agreement. In general whenever an issue is to be solved simply by interpreting a writing alone, it is a question of law for the judge, *see* Ammons v. Franklin Life Ins. Co., 348 F.2d 414, 416 (5 Cir. 1965). We also think that it is significant that the Court in *Cosmopolitan, supra,* and in its companion case, Weade v. Dichmann Co., 337 U.S. 801, 69 S.Ct. 1326, 93 L.Ed. 1704 (1949), had no difficulty in deciding as a matter of law, under an agency agreement, who should be responsible as the Jones Act employer.

 Therefore, considering the documents and oral testimony in the light of the applicable law, we conclude that there was no basis upon which to submit the employment issue to the jury in the trial below.

As the disposition of this case calls for a new trial it is necessary to discuss three remaining points raised on the appeal. See Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 569, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958).

Among the allegations of negligence, the plaintiff had charged that the doctors in the hospital had failed adequately to diagnose and treat Graser. At trial, the plaintiff introduced several documents from the Bahrain hospital and produced the testimony of several American doctors to support his claims of improper care. The court, however, dismissed all of the plaintiff's claims having to do with Graser's care after he was admitted to the hospital. The record on appeal is very sketchy in regard to the evidence offered on this issue, but the ruling was erroneously sweeping and a discussion of the principles applicable to the claim is required.

 The maritime law has long imposed upon shipowners the duty to provide proper medical treatment for seamen falling ill or suffering injury in the service of the ship. This is a duty imposed without fault; it is no mere formal obligation, De Zon v. American President Lines, 318 U.S. 660, 667–668, 63 S.Ct. 814, 87 L.Ed. 1065 (1943); The Iroquois, 194 U.S. 240, 241–242, 24 S.Ct. 640, 48 L.Ed. 955 (1904), and a violation of it is actionable under the Jones Act, Cortes v. Baltimore Insular Line, 287 U.S. 367, 376, 53 S.Ct. 173, 77 L.Ed. 368 (1932).

 In the circumstances of this case, there are two ways in which the shipowner may have been negligent in exercising this duty. One is in improperly providing for a seaman's care, including the negligent selection of a doctor; the other is in the negligence of the doctor himself, *see De Zon, supra*

318 U.S. at 664–665, 63 S.Ct. 814; Central Gulf Steamship Corp. v. Sambula, 405 F.2d 291 (5 Cir. 1968).[6]

■■■■ Because of the guardian-ward relationship between the master and his seamen, the master is required to exercise due care in providing for his men who become ill. What care is required in a specific instance depends largely on the facts of the case—the seriousness of the injury or illness and the availability of aid, De Zon, supra, 318 U.S. at 667–668, 63 S.Ct. 814; see also Sambula, supra, 405 F.2d at 300. Therefore, the trier must take into account such factors as whether the ship was at sea or in port and, if in port, what medical facilities were available, and, if such facilities were obviously extremely limited or inadequate, what means were reasonably obtainable to transfer the seaman to the nearest adequate medical facility. No ironclad rule can be applied. In the present case, however, the plaintiff principally attacks the kind and quality of the care which the doctors provided.

Among certain FELA statutes which are made applicable to Jones Act cases is 45 U.S.C.A. § 51 which provides that an employee may recover for the negligence of the agents of the employer. The Supreme Court has held that an accommodating scope must be given to the term "agent" and if "injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within the meaning of § 1 of FELA," Sinkler v. Missouri Pacific R. Co., 356 U.S. 326, 330–332, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958).

■■■■ Under this test, doctors and hospitals may be agents of the employer; there is no reason why a physician cannot be an agent, see Knox v. Ingalls Shipbuilding Corp., 158 F.2d 973, 975

(5 Cir. 1947), and in the present case medical services were provided, under contract, for the shipowner as part of its operational activities. Therefore, the negligence of a doctor may be imputed to the shipowner-employer, see Sambula, supra, 405 F.2d at 301–302; see also Hopson v. Texaco, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (1966), in which the negligence of a taxi driver taking sick seamen from the ship to the United States Consul's office in Trinidad was imputed to the shipowner.

One issue implicit in the claim of negligence in this case is the standard of care required by a physician in a foreign land. The "community" or "locality" rule has traditionally been applied in malpractice suits in this country with the result that a physician is held only to the standard of care existing in the area in which he practices. There is, however, some recent authority in favor of moving away from this rule toward one which is free of geographical requirements, see, e. g. Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793 (1968); W. Prosser, The Law of Torts, § 32, at 166–67 (3rd ed. 1964).

■■■■ This approach is preferable in admiralty cases and should be used instead of the older locality rule. Both the duty to provide maintenance and cure and the Jones Act are maritime provisions designed to compensate for the often harsh and dangerous life of a seaman. To require him to prove the standard of care of the medical profession in some far distant land is incompatible with their intent and purpose. Assuming that reasonably adequate medical facilities were available, the proper standard for malpractice is simply whether the physician exercised the degree of care and skill of the average qualified practitioner of the art and science of medicine. The defendant,

---

6. Although one act of negligence may result in liability for both reasons, it is not necessarily so. For example, the ship's master may negligently select a general practitioner when a specialist was needed and available. The shipowner could then be liable, even though the doctor selected was not personally negligent in his treatment. On the other hand, the master may take due care in selecting a reputable physician, but if that physician is negligent, the shipowner will still be liable.

however, must bear the burden of proving that adequate medical facilities or services were not reasonably available or that the circumstances were such that the standard could not possibly be applied.

■ The plaintiff must, of course, show that the negligence was the proximate cause of decedent's death. The test is:

"whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought," Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L. Ed.2d 493 (1957).

The plaintiff could have made out a *prima facie* case on the issue of causation, if he could have introduced sufficient evidence to show that Graser's condition, when he entered the hospital, was such that there was a reasonable probability that proper care would have prevented his death. Once this was done, the burden shifted to the defendant to show that the improper care did not cause his death, *see* Rewis v. United States, 369 F.2d 595, 599, 603 (5 Cir. 1966).

■ As plaintiff claimed at trial, he did not need specific medical testimony to prove that the doctor's negligence was a proximate cause of death. The jury decides whether or not there was proxi-mate cause, and they may do so both in the absence of direct medical testimony on the point, Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109–110, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959); Wilkins v. American Export Isbrandtsen Lines, 446 F.2d 480, 483 (2 Cir. 1971), and, in certain circumstances, even counter to the only medical testimony on causation, *see* Crescent Wharf & Warehouse Co. v. CYR, 200 F.2d 633, 636 (9 Cir. 1952). But, of course, the jury is not permitted to speculate on proximate cause in the absence of reasonably persuasive proof that the negligence was the probable cause of the injury, *see* Sentilles, *supra,* 361 U.S. at 110, 80 S.Ct. 173.

Another point raised by the appellant concerns the admissibility of the hospital records of decedent's wife, Jeanne Graser. She had been the original plaintiff in this action, but had died prior to trial. The records were admitted into evidence over the plaintiff's objection that they violated the New York patient-physician privilege statute, N.Y.C.P.L.R. § 4504 (McKinney 1963), as amended, (Supp.1971).[7]

■ The plaintiff, in order to enhance the claim for damages had put in evidence, over objection, the testimony of Rita Lord, Mrs. Graser's sister, to the effect that the Grasers had had a happy marriage and family life, that they loved and cared for their children,

---

7. The pertinent portions of § 4504 are as follows:

"(a) Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing or dentistry shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

\* \* \* \* \*

(c) Mental or physical condition of deceased patient. A physician or nurse shall be required to disclose any information as to the mental or physical condition of a deceased patient privileged under subdivision (a), except informa-tion which would tend to disgrace the memory of the decedent, either in the absence of an objection by a party to the litigation or when the privilege has been waived:

1. by the personal representative, or the surviving spouse, or the next of kin of the decedent; or

2. in any litigation where the interests of the personal representative are deemed by the trial judge to be adverse to those of the estate of the decedent, by any party in interest; or

3. if the validity of the will of the decedent is in question, by the executor named in the will, or the surviving spouse or any heir-at-law or any of the next kin or any other party in interest. \* \* \*"

and that the decedent would have contributed to the support and nurture of his children had he lived. The defendant, in rebuttal, successfully introduced three sets of records from the Bergen Pines Hospital [8] which tended to show that the Grasers had had very deep marital discord, that Mrs. Graser was an alcoholic, and that she had very little concern for her children.

The most important evidence, as far as the defendant was concerned, was a lengthy interview taken by a psychiatric social worker. The other hospital records, made by doctors and nurses, were only cumulative to this. Therefore, even if New York law does apply in this situation,[9] § 4504, by its terms, does not bar the admission of the conversation with the social worker who is outside of the coverage of the privilege.

In some circumstances it might be proper to apply § 4504 to a psychiatric social worker,[10] but we do not feel that an extension of the statute is warranted here. Because there was no physician-patient privilege at common law, we are reluctant to go beyond the strict language of the statute, and the New York courts have shown no tendency to broaden the types of communications covered, *see* McKeever v. Teachers' Retirement Bd., 99 N.Y.S.2d 884 (Sup. Ct.1950); Munzer v. Blaisdell, 183 Misc. 777, 49 N.Y.S.2d 915 (1944), aff'd, 269 App.Div. 970, 58 N.Y.S.2d 359 (1945) (the official in charge of a mental institution does not become a physician for purposes of the privilege statute).

It must be borne in mind that Fed.R. Civ.P. 43(a) encourages admissibility whenever there is any question of doubt. Finally, there is the fairness aspect. Although under New York law there can be no waiver when material disgraces the memory of a decedent and falls within the confines of § 4504(a),[11] we are not inclined to extend the scope of the section, even if we could, when to do so would give one party an unfair advantage. Here, the plaintiff had put in testimony that the Grasers had had a fine marriage relationship and family life. Absent a clear public policy to the contrary, it would be unjust to deny the defendant an opportunity to rebut this. Therefore, in this case, we find that the plaintiff should have been estopped from objecting to the use of the interview with the social worker after he introduced Mrs. Lord's testimony, *cf.* Unit-

8. The first set referred to an out-patient visit to a psychiatric clinic on May 17, 1962. The record contains a summary of an interview between Mrs. Graser and a psychiatric social worker as well as some diagnostic statements by a psychiatrist.

The second set concerned Mrs. Graser's admittance to the hospital from June 21 to July 6, 1963 for pneumonia and chronic alcoholism. Most of the contents are entries by doctors and nurses.

The third set refers to Mrs. Graser's stay in the psychiatric ward from January 25 to January 30, 1964. In addition to comments by doctors and nurses, this set also contains some interview notes by unknown persons.

9. This court has previously concluded that the New York privilege statute should be applied in the federal courts sitting within that state, Massachusetts Mutual Life Insurance Co. v. Brei, 311 F.2d 463 (2 Cir. 1962). However, *Brei* and similar cases all discuss the issue in the context of diversity jurisdiction, whereas this action is based upon a federal question. Therefore, especially in light of possible waiver in this case and Fed.R.Civ.P. 43 (a) which encourages admissibility, we are not convinced that *Brei* should apply here.

10. The proposed Federal Rules of Evidence seem to recognize this position by providing a privilege for a psychiatrist *or one* "reasonably believed by the patient so to be," 51 F.R.D. 315, 366 (1971). (Emphasis added.)

11. Section 4504(a) provides a patient privilege with physicians and nurses. Under § 4504(c), if the patient is dead and the privileged matter would tend to disgrace his memory, the privilege can never be waived, Eder v. Cashin, 281 App.Div. 456, 120 N.Y.S.2d 165, 170 (1953); Mulligan v. Sinski, 156 App.Div. 35, 140 N.Y.S. 835, 838 (1913), aff'd 214 N.Y. 678, 108 N.E. 1101 (1915).

ed States v. Baird, 414 F.2d 700, 707 (2 Cir. 1969), cert. denied, 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970); D'Aleman v. Pan American World Airways, 259 F.2d 493, 496 (2 Cir. 1958).

Nothing which we have said in regard to this privilege question, however, should be construed on retrial as a bar to the judge's exercise of discretion in refusing to admit any of the hospital records for other evidentiary reasons.

In his final point, the appellant asserts that, because of the Supreme Court decision in Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which was handed down between the date of the judgment of the district court and the hearing of this appeal, he now has a right to recover for the decedent's death because of the unseaworthiness of the ATLAS. But, even though the appellant may have had a valid claim for unseaworthiness, he is time-barred from asserting it.

The decision in *Moragne* was primarily concerned with the lack of an admiralty remedy for wrongful death within American territorial waters. In 1920 the Death on the High Seas Act, 46 U.S.C.A. § 761, provided a remedy for death occurring "beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." And there is no doubt that this Act provided a remedy for death caused by unseaworthiness to a seaman such as Graser, Doyle v. Albatross Tanker Corp., 367 F.2d 465 (2 Cir. 1966), *see also Moragne, supra,* 398 U.S. at 395, 90 S.Ct. 1772. Before *Moragne,* however, anyone killed within a marine league of the United States was forced to rely on state law for any unseaworthiness claim which he might have.

Although the plaintiff conceded at trial that any claim under the Death Act was time barred by the two year statute of limitations, see 46 U.S.C.A. § 763, he argues that *Moragne* somehow permits it. With this we disagree. Since Congress "has paramount power to determine the maritime law," Detroit Trust Co. v. Barlum S.S. Co., 293 U.S. 21, 43, 55 S.Ct. 31, 38, 79 L.Ed. 176 (1934), it can both create and take away any cause of action within the admiralty jurisdiction, *see also,* Fitzgerald v. United States Lines, 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 40–41, 63 S.Ct. 488, 87 L.Ed. 596 (1943). If it has this power, it may certainly specify the details of the remedy which it provides. Therefore, because Graser comes within the ambit of the Death Act, he is also barred by its two-year statute of limitations.

Even if the plaintiff's claim is regarded as a "separate" cause of action under the general maritime law, *Moragne, supra,* 398 U.S. at 396, note 12, 90 S.Ct. 1772, it would still be time-barred. The Court in *Moragne, supra* at 406, 90 S.Ct. 1772, stated that the doctrine of laches would apply but indicated that the two-year limitation period of the Death on the High Seas Act would be used by analogy in wrongful death cases arising under general maritime law. This court has followed that suggestion, absent a strong justification for delay, in Raskin v. P. D. Marchessini, Inc., 437 F.2d 563, 566 (2 Cir. 1971); see also McGlenon v. Boeing Co., 437 F.2d 433, 435 (9 Cir. 1971); but see Thomas v. C. J. Langenfelder & Son, Inc., 324 F.Supp. 325 (D. Md.1971), where the court refused to apply a two-year limitation period when a claim for unseaworthiness arising out of a death in territorial waters was joined to a Jones Act claim.[12] There-

12. It may be argued that the words of Chief Justice Warren in McAllister v. Magnolia Petroleum Co., 357 U.S. 221, 224, 78 S.Ct. 1201, 1204, 2 L.Ed.2d 1272 (1958), "where an action for unseaworthiness is combined with an action under the Jones Act a court cannot apply to the former a shorter period of limitations than Congress has prescribed for the latter," would give support to the plaintiff's position. But, it is not so because *Magnolia Petroleum, supra,* decided in the pre-*Moragne* era, simply held that a state court could not use its own statute of

fore, the plaintiff is not entitled to have a trial on his unseaworthiness claim.

We are satisfied that the jury's verdict was based upon an erroneous understanding of the law. The judgment of the district court is reversed and the case is remanded for a new trial.

limitations on an unseaworthiness claim to force a plaintiff to bring his action before the three years allowed by Congress for a Jones Act complaint. Here, the two-year limitation under the Death on the High Seas Act is provided by Congress and the use of it as an analogous standard for a general maritime law death case cannot be said to oust Congress of its paramount position in the admiralty field.

One should also note that even though the court in Batkiewicz v. Seas Shipping Co., 53 F.Supp. 802 (S.D.N.Y.1943), permitted the plaintiff to amend his complaint to allege a cause of action under the Death on the High Seas Act more than two years after the right matured, the action itself was brought within the two year period.