**James R. COULTER,**
**Plaintiff-Appellant,**

v.

**INGRAM PIPELINE, INC., et al.,**
**Defendants-Appellees.**

**No. 73–2721.**

United States Court of Appeals,
Fifth Circuit.

April 21, 1975.

---

Charles R. Maloney, Donald B. Ruiz, New Orleans, La., for plaintiff-appellant.

Walter W. Christy, John F. Blackwell, New Orleans, La., for defendants-appellees.

Before GEWIN, AINSWORTH and GEE, Circuit Judges.

GEWIN, Circuit Judge:

Plaintiff-appellant, James R. Coulter, brought this admiralty suit against Ingram Pipeline, Inc. and its insuror, Insurance Company of North America, for injuries sustained while employed as a stabber (pipe layer) aboard defendant's barges. The issues of negligence, unseaworthiness, and damages were tried by a jury resulting in a net award to appellant of $20,000. Appellant's maintenance and cure claim, reserved to the court, was dismissed, the court holding that he had forfeited his right to maintenance and cure by abandoning the rehabilitative program prescribed by his physician. This appeal is solely from that portion of the judgment dismissing the demand for maintenance and cure.[1] The appellant contends that

---

1. "No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure." McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20, 24 (1954). That is to say the Court of Appeals may not set aside the judgment of the district court unless it is clearly erroneous. A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948).

The findings of the district court are general and conclusory. We quote the pertinent portions of the district court's judgment or order:

1) Plaintiff was injured on May 21, 1970.

he was never cured or pronounced incurable, and argues that he never willfully abandoned medical treatment proffered by appellees. We reverse and remand.

The appellant was injured on May 21, 1970, when a twelve-ton pipe on an Ingram Lay Barge inadvertently swung toward him and struck him in the chest. He received "a crushing type of injury to his chest" including several fractured ribs, some of which did not heal "by bony union." The pipeline company provided medical treatment but due to the extreme obesity of appellant (350–375 pounds) recovery was slow and he was ultimately referred to Dr. Robert J. Schramel a thoracic and cardiovascular surgeon retained by the appellee-insurance company for additional consultation. The surgeon recommended a strict diet and a regimen of physiotherapy and on January 4, 1971, admitted appellant to the New Orleans Medicenter. The appellant was placed on a daily diet of 1500 calories and an exercise program, the combined result of which was a weight loss of approximately 33 pounds. On January 22, 1971, at his own request, and after assuring his physician that he would maintain the diet and exercise at home, appellant was discharged from the Medicenter. Sometime thereafter the appellant admittedly discontinued his rehabilitative program. In early February, 1971, the apparently prescient appellees terminated maintenance and cure payments. Subsequent to the termination, Dr. Schramel on March 3, 1971, wrote a letter to appellees in which he indicated, in a very optimistic manner, that appellant's rehabilitation was progressing well and that it should ultimately result in appellant's return to his former employment. It was not until July 28, 1971, when Dr. Schramel examined appellant again that he knew his patient had failed to follow the prescribed diet and exercises and weighed more than ever. Dr. Schramel reported to appellees on October 13, 1971 that appellant's condition was essentially unchanged, opining that proper conditioning might still result in appellant's eventual return to his former employment.

In April 1972, the appellant was examined by an orthopedist who was unable to suggest any means of alleviating appellant's continuing discomfort. The orthopedic surgeon thought at that time there was no physical impediment to appellant's returning to work. Finally, on March 14, 1973, shortly before the trial the thoracic surgeon re-examined appellant and stated that his original findings were essentially unchanged and that with conditioning the appellant could gradually return to work.

The evidence shows and the appellant admits that he failed to follow his physician's instructions. The appellees justified the cessation of maintenance and cure payments by characterizing appellant's failure to follow the physician's advice as a knowing and willful abandonment of his prescribed cure and the district court agreed.

■■ The general rule is well settled that a seaman's right to maintenance and cure is forfeited by a willful rejection of the recommended medical aid. Leocadio v. Lykes Bros. Steamship Co., 282 F.Supp. 573 (E.D.La.1968); Murphy v. American Barge Line Co., 169 F.2d 61 (3d Cir. 1948), cert. denied, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406. However, this rule is not inexorably applied and exceptions exist when reasonable grounds for refusing care or failing to follow instructions are shown. Murphy

2) Thereafter plaintiff was examined by various doctors and received medical and hospital treatment at the expense of defendant and was paid maintenance and cure by defendant at the rate of $10.00 per day until early in February, 1971.

3) At approximately the time payments for maintenance and cure were discontinued plaintiff voluntarily left the Medicenter in New Orleans, where he had been treated for 20 or 21 days in order to reduce his weight and had been instructed in the performance of certain exercises designed to strengthen his muscles.

4) After leaving the Medicenter, plaintiff failed to follow the recommendations of Dr. Schramel that he continue on a diet in order to lose substantially more weight and to continue his regimen of exercises.

5) Plaintiff is not entitled to further payments of maintenance and cure by defendant.

v. American Barge Line Co., *supra*; Luth v. Palmer Shipping Corp., 210 F.2d 224 (3d Cir. 1954); Oswalt v. Williamson Towing Co., 488 F.2d 51 (5th Cir. 1974); Macris v. Sociedad Maritima San Nicholas S. A., 245 F.2d 708 (2d Cir. 1957).[2] The question then is whether there existed any extenuating circumstances which made the appellant's failure to follow the prescribed regimen either reasonable or something less than a willful rejection. We think that such circumstances did exist.

In the first place the evidence indicates that the appellant has always been an extremely obese man, weighing approximately 350 pounds prior to his injury. Common sense and personal experience tell us how emotionally and physically difficult it would be for a person of this size to maintain an exercise program and a daily diet of 1500 calories without supervision and medical advice. It is a matter of record that it was never the intention of Dr. Schramel or the barge owners to keep the appellant in the Medicenter for the duration of his rehabilitation program, but some provision for regular re-examination at intervals of less than six months was called for[3] to

provide the kind of support, guidance, and instruction one might reasonably expect the appellant to need in order to successfully attain his maximum cure. The appellant's difficulty in maintaining his rehabilitative program was further exacerbated by the fact that subsequent to his injury financial responsibilities demanded that both appellant and his wife become employed at appellant's father's store, leaving little time for adequate care of their three children, to say nothing of time necessary to prepare special meals for appellant.

■■ In addition, we note that in the instant case it was never shown that the appellant realized the maximum possible cure and that at the time maintenance and cure payments were terminated no physician had ever certified him as fit to return to work.[4] Yet, the appellees terminated maintenance and cure payments in February of 1971, shortly after appellant left the New Orleans Medicenter where he had been admitted in order to become familiar with dietary and exercise programs he was to continue at home. Perhaps the appellees originally improperly construed appellant's discharge as signifying maximum cure.[5]

2. In Murphy v. American Barge Line Company, *supra*, for example, the court stressed the affirmative nature of the master's duty to care for the seaman, in holding that a mere offer to provide hospitalization for the injured seaman was insufficient under the circumstances to relieve the shipowner from liability for maintenance and cure. "A hospital ticket *without more under these circumstances does* not discharge the obligation since we think the instant case represents a situation where the offer to provide hospitalization must include the means by which the injured seaman can get to the hospitalization suggested." *Id.*, 169 F.2d at 64. The court also noted that the libellant was in his fifties, that he had a family of five children, and that he was in considerable physical distress. The appellant in the instant case is similarly situated.

3. We do not presume to say that Dr. Schramel's medical procedures were unsound. The record indicates that the infrequency with which the appellant was examined was a result of the failure of the appellees to schedule regular check-ups for the appellant. In any case, the appellees who were ultimately responsible for providing medical treatment for the appellant, may also be responsible for the

negligent selection of a physician and/or the negligence of the physician. Fitzgerald v. A. L. Burbank & Co., 451 F.2d 670 (2d Cir. 1971); Central Gulf Steamship Corp. v. Sambula, 405 F.2d 291 (5th Cir. 1968).

4. A seaman's right to maintenance and cure continues until the maximum possible cure has been effected. M. Norris, The Law of Seaman § 560 (2d ed. 1962); G. Gilmore and C. Black, The Law of Admiralty 262–268 (1957); Leocadio v. Lykes Bros. Steamship Co., 282 F.Supp. 573 (E.D.La.1968).

Where *no further improvement can be ex-*pected from further treatment and care of a continuing disability resulting from injuries sustained by a seaman, the seaman has reached maximum cure and no further obligation exists for the shipowner to pay maintenance and cure. Leocadio v. Lykes Bros. Steamship Co., 282 F.Supp. 573, 575 (E.D.La.1968).

5. A seaman's right to further maintenance and cure is not automatically barred by his request for and subsequent voluntary discharge from a hospital. *See, e. g.*, Moyle v. National Petroleum Transport Corp., 150 F.2d 840 (2d Cir. 1945); Rey v. Colonial Nav. Co., 116 F.2d 580 (2d Cir. 1941).

The inaccuracy of such an assessment of the situation should have been readily evident to appellees on reading Dr. Schramel's March 3 letter evincing a promising outlook for appellant's further rehabilitation. Curiously, no additional investigation of the situation occurred and no further maintenance and cure payments were forthcoming. We feel that the appellees' failure to question the termination of maintenance and cure, an action obviously incompatible with Dr. Schramel's March 3, 1971 letter, amounted to a breach of the longstanding affirmative duty of the shipowner to provide proper medical treatment for seamen injured in the service of their ship, and to an unjustifiable erosion of the special status afforded seamen as "wards of the admiralty." M. Norris, The Law of Seamen § 574 (2d ed. 1962); Fitzgerald v. A. L. Burbank & Co., 451 F.2d 670 (2d Cir. 1971). Under the facts and circumstances disclosed by the record we cannot condone the suspension of maintenance and cure payments on the basis of information gleaned some time well after the fact. By prematurely terminating maintenance and cure payments the appellees may have significantly contributed to the financial and other difficulties which caused appellant's failure to strictly adhere to the prescribed but unsupervised rehabilitative program.[6] This being the case the appellant's original failure to follow his physician's instructions is not the kind of rejection of proffered medical treatment which can be seized upon in order to justify the termination of maintenance and cure. We seriously doubt that it was reasonable to expect a satisfactory cure or recovery by the prescription of diet and exercise without medical supervision and guidance.

■ On the other hand there is evidence in the record that at some time appellant may have wilfully rejected proffered medical care. For example,

6. *See* Sobosle v. United States Steel Corp., 359 F.2d 7, 12 (3d Cir. 1966):
   We therefore must be mindful in the present case of the extent to which the seaman's conduct was influenced by her

the appellees did arrange a July 1971 appointment for appellant with Dr. Schramel, and the doctor's testimony with respect to that meeting intimates that appellant demonstrated a lack of resolve to continue the prescribed exercise and diet. The acute physical discomfort and inconvenience inherent in a regimen such as the one prescribed for appellant standing alone may not be legally sufficient excuses for failing to follow the recommended rehabilitation program. Murphy v. American Barge Line Co., 169 F.2d 61 (3d Cir. 1948), cert. denied, 335 U.S. 859, 69 S.Ct. 133, 93 L.Ed. 406.

A proper application of the legal principles herein discussed should be made by the district court after a factual determination has been made by that court with regard to the conduct of the appellees in terminating maintenance and cure and the conduct of the appellant in failing to adhere strictly to the prescribed treatment without medical aid and supervision. After making such appropriate findings of fact that court should carefully consider whether under the peculiar situation in this case, the interests and principles protected by the rule of forfeiture would be served properly by its application to the appellant resulting in a denial of maintenance and cure in view of the liberal and well established concepts applicable to an injured seaman.

Accordingly, the judgment of the district court is reversed and the case is remanded for findings not inconsistent with this opinion with respect to whether appellant knowingly and without justification rejected the prescribed regimen of exercise and diet at some time later than February 1971.

Reversed and remanded with directions.

GEE, Circuit Judge (dissenting):

The foundations of the law maritime will not likely be shaken by the amiable

mental or physical incapacity in determining whether her failure to accept medical aid should result in the absolute termination of this shipowner's duty to continue providing maintenance and cure.

result which the majority reaches. Under it the district court is to reconsider whether a fat seaman, unwilling to stay on his diet but able to con the treating physician provided by the shipowner into releasing him from supervision, should or should not be rewarded for his eloquence, and if so, by how much. No one seriously disputes that had Coulter kept on his diet he would have attained maximum recovery. No one argues that he did not abandon it about the time maintenance was stopped, like one who drops a glass bottle of nasty but curative medicine. Yet somehow it has been determined that his abandonment of it may not have been an *unreasonable* refusal of treatment. This conclusion seems to rest on the shipowner's failure to pursue Coulter with sufficient ardor, nagging and beseeching him (presumably, since it could not force him) to stick to tea and celery and leave the beer and beans alone.

Language in Oswalt v. Williamson Towing Co., Inc., 488 F.2d 51 (5th Cir. 1974) is exactly in point here:

A forfeiture for unreasonable refusal is called into play in one of two ways. First, the seaman may simply reject all timely medical attention or quit participation in a course of therapy already begun. In such a case, the right to maintenance and cure is forfeited because the purpose of the award can no longer be achieved. These conjunctive remedies do not operate as substitutes for damages; they are not general compensation, but rather are directed toward the specific objective of providing for the subsistence and medical expenses of a seaman until he has reached the point of maximum possible cure. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Price v. Mosler, 5 Cir. 1973, 483 F.2d 275. When, therefore, that point is either reached or the erstwhile patient voluntarily stops short of its attainment by refusing medical attention, the justification for the payments likewise ceases. Brown v. Aggie & Millie, Inc., [5 Cir. 1973, 485 F.2d 1293] supra.

*Oswalt* at 53–54.

The fact that Coulter would have received maintenance for at least six months had he not discontinued his treatment seems to me immaterial. Maintenance is an award designed to provide succor for the seaman, not until he becomes well, but while he is undergoing treatment designed to bring him to maximum cure. Indeed, it may be seen as an inducement to do so. Maximum cure is one terminal point of the shipowner's obligation to pay maintenance. Abandonment of treatment is another.

It well may be that Coulter would be entitled to maintenance at our hands if he could show that his condition had originally been pronounced hopeless and that a new type of treatment had later been discovered. But here there is nothing which leads anywhere but to the conclusion that had Coulter followed the doctor's orders he would have lost weight and that had he lost weight his ribs would have knit. It seems unreasonable to expect a shipowner to maintain a seaman on an on-again-off-again basis whenever the seaman decides to give a known treatment another chance.

Further, as noted above, however benevolent to Coulter the majority's result may be, casting the shipowner for failing to make a seaman do a thing it had no power to require seems to me unjust— let alone rewarding the seaman for his own delinquency. Even afloat, responsibility for a result should not be pressed much beyond power to effect it. Charitably doing so here, we inch toward new heights of anachronism the image of that noble but feckless Ward of the Admiralty, the sea-chest-bearing sailor with heart of oak, good company on a voyage to Treasure Island but scarce among the ranks of today's seagoing technicians.

I would affirm.