**BUCH v. UNITED STATES.**

United States District Court,
S. D. New York.

June 9, 1954.

Harry Eisenberg, New York City,
(Jacob Rassner Emanuel Hirschberger,
New York City, of counsel), for libelant.

J. Edward Lumbard, U. S. Atty., New
York City, Lloyd, Decker & Williams,
New York City, of counsel, Gray Williams, New York City, advocate, for respondent.

WEINFELD, District Judge.

Libelant, a seaman employed aboard
the S. S. Earl A. Bloomquist, sustained
serious and permanent injuries as a result of a fall into the hold of the barge
Comptoir 4 from a Jacobs ladder rigged
over the side of the Bloomquist to the
barge which was flush against the side
of the ship. The Bloomquist, moored off
shore in the Port of Rotterdam, Holland,
had been engaged in unloading a coal
cargo into the Comptoir 4 and other
barges through the use of floating
cranes. This unloading operation prevented direct means of egress and ingress from the Bloomquist to shore, since
the position of the receiving barges and
operating cranes blocked off and made
unavailable for use by crew members of

the Bloomquist all of its accommodation ladders. To reach shore it was necessary to go from the Bloomquist onto a barge by a Jacobs ladder supplied by the barge, from which a launch would take the men ashore.

Libelant had been granted shore leave and he left the Bloomquist sometime between 5:45 and 6:00 p. m. by means of a Jacobs ladder which led from the port rail of the Bloomquist down to the Comptoir 4—the only method then open to him to reach shore. At the time of the accident the hatches of the Comptoir were open to receive coal from the Bloomquist and were surrounded by steel hatch coamings twenty-one inches in height and approximately six inches wide. Between the hatch coaming and the outer side of the barge was a narrow area or catwalk, also of steel, approximately thirty inches in width. The Jacobs ladder from which libelant descended did not reach the narrow deck of the barge. Its bottom step was approximately three to four feet above it and approximately two feet above the hatch coaming.

Libelant, while trying to gain a firm foothold in stepping down from the last rung of the Jacobs ladder onto the deck of the barge or the coaming slipped and missed his footing and was plunged into the open hatch, a distance of twenty feet. The hatch coaming and the deck were both covered with wet coal and wet coal dust.

Libelant seeks to recover on both unseaworthiness and negligence. Respondent as owner of the Bloomquist was under an absolute and non-delegable duty to crew members to provide a seaworthy ship and safe and seaworthy appliances.[1] It was required to afford libelant a safe means of ingress and egress from the vessel through its own equipment or that supplied by others upon whom it relied.[2] The fact that the barges supplied the ladder when those of the Bloomquist were inaccessible and unavailable for use, did not relieve it of its absolute duty to provide a seaworthy vessel and appurtenant appliances and equipment.[3]

I find that the ladder supplied by the Comptoir 4, the only one available for libelant's use, was not reasonably adequate to provide a safe means of egress from the ship to the barge; it was of insufficient length and its bottom rung was three to four feet above the deck of the Comptoir.[4] Under the prevailing conditions it was not reasonably fit for the use for which it was intended and was an inadequate appliance and not much different from a totally defective one. The failure of the Bloomquist to supply or cause to be supplied an adequate Jacobs ladder or other adequate appurtenance for leaving the ship rendered it unseaworthy.[5]

The respondent also failed in its duty to exercise reasonable care to provide

1. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Seas Shipping Co., Inc., v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Sanford v. Caswell, 5 Cir., 200 F.2d 830; The H. A. Scandrett, 2 Cir., 87 F.2d 708.

2. Grillo v. Royal Norwegian Government, 2 Cir., 139 F.2d 237; Cannella v. Lykes Bros. S. S. Co., 2 Cir., 174 F.2d 794; Brown v. Pennsylvania R. Co., 2 Cir., 158 F.2d 795.

3. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, affirming, 9 Cir., 205 F.2d 478.

4. The exact distance by which it failed to reach the deck was a contested issue. Cook, a seaman who was present and observed the accident, testified through deposition: "[T]he ladder was wobbling but I'd say between the scow and the end of the ladder, I'd say maybe three or four or five feet to the scow, the bottom of the scow and when you come to the last step you had to lower yourself until you come to your hands on the bottom of the ladder until you put your feet on the scow." Young, respondent's chief mate, conceded that the bottom rung was about two feet from the deck of the barge.

5. The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760.

reasonably safe means for its crew members to leave the vessel. It was dusk when the accident occurred. The Bloomquist and the barge had been and were being buffeted by a choppy sea and a strong wind. It had been raining hard. The hatch coaming and the deck of the barge were covered with wet coal dust and wet coal, making them slippery.

The insufficient length of the ladder and the wet and slippery condition of the restricted area of the coaming and catwalk made it difficult and dangerous for men descending the ladder to secure a firm foothold on either. This wet and slippery condition of the narrow deck and hatch coaming, the rise and fall of the vessel due to the choppy sea and strong wind, and the absence of any guards or other protective devices around the open hatch rendered the entire area of the barge unsafe to men who were required to jump or take a long step from the bottom rung of the inadequate ladder. And the owner appears to have taken no action to abate the conditions or to have exercised any care in the matter at all. The use of the inadequate ladder and the general conditions attendant upon its use continued for a sufficient period of time prior to the accident to have charged the respondent with knowledge.

█ The direct and proximate cause of libelant's fall in the coal barge while attempting to gain a foothold on the deck of the barge was the concurrent unseaworthy condition of the vessel and the negligence of the respondent. I further find that respondent failed to sustain its burden of proof that the libelant was guilty of contributory negligence. Libelant proceeded by the only means available for departure from the ship and under the attendant circumstances exercised reasonable care in descending the ladder.

█ Libelant sustained severe and serious injuries, some of which are permanent. He was hospitalized at Rotterdam, Holland, from the date of the accident, November 23rd, 1951, to January 2nd, 1952, and then was flown to the United States where he was an in-patient at the United States Public Health Service Hospital at Staten Island from January 17th to February 13th, 1952. Thereafter he was treated as an out-patient until July 23rd, 1952, when he was discharged as "having attained maximum hospital benefit and permanently not fit for duty." He has not received any hospital treatment since, but the medical experts called by the parties are in agreement that libelant suffered serious brain injury, the results of which are permanent, although they differ on the extent of the injury and also whether or not he is totally and permanently disabled from engaging in gainful occupation.

Since the accident libelant has not worked and I find that this is the proximate result of his injuries and that he will continue to be so totally disabled by reason of such injuries until the end of July, 1954, two years from the date of his hospital discharge. Thus he is entitled to loss of earnings for a period of two years and nine months. Libelant's wage rate as an ordinary seaman was $225 per month, and with overtime he earned about $250 per month when employed. His experience record indicates that he worked on the average of no more than eight months a year or earned approximately $2,400 per annum. Damages for lost wages amount to $6,600.

I accept the opinion of libelant's neurologist that a re-educative rehabilitation program is required—one that should have been undertaken earlier—before it can be said with reasonable certainty that libelant has reached the point of maximum possible cure. The neurologist suggested a period up to five years, but upon a review of the entire evidence, including the testimony of respondent's expert, I fix the period of the rehabilitative program as two years from the date of his discharge from the hospital. Such a program, which still can, and should, be undertaken, if successful, would enable libelant to use his right hand and otherwise function so as to equip him to engage in some gainful occupation. In-

deed, such a program is essential if libelant's existing total disability is to be eliminated so as to render him only partially permanently disabled. Accordingly, he is entitled to additional maintenance and cure for two years from July 23rd, 1952 (the date of last payment), to July 23rd, 1954, which I find as the date of maximum possible cure, at the stipulated rate of $8 per day, a total of $5,840.

There remains for consideration the items of prospective loss of earnings, pain and suffering, and nature and extent of injuries. At the time of the accident libelant was thirty years of age with a life expectancy of 35.33 years. However, as already noted, his work record for a number of years prior to the accident indicates that he worked no more than eight months in any one year. The conclusion is warranted that his work-life expectancy is thirty years. With his limited education it is unlikely that his earnings would ever exceed that of an able bodied seaman, the present rate being $314 per month plus overtime and found.

The record does not support libelant's contention that he is totally and permanently disabled from engaging in any occupation. At the end of the rehabilitative program he should be able to engage in some gainful occupation during the period of his work expectancy. However, I am satisfied that his earning capacity has been considerably reduced and he is entitled to recover damages for its partial permanent impairment, which I fix at the rate of $1,800 per annum for thirty years. The present value of an annuity certain at $1,800 per year for thirty years at 4% is $31,126.

Libelant was unconscious for two weeks following the accident. He suffered excruciating pain over an extended period of time. As already noted, some of his injuries are permanent. He has a hemiplegia with left-sided weakness, partial paralysis of the face, impairment of speech so that his words are slurred and general lack of coordination. There is a drag of his left foot in walking and clumsiness in his left limb and fingers. (Libelant was left-handed.) The symptoms indicate damage to the mid-brain area and a certain amount of permanent cerebral impairment. There are neurological changes involving various brain changes. Damages for loss of future earnings and pain and suffering and the nature and extent of injuries are fixed at $45,000.

In sum, libelant is entitled to a decree upon the claim for unseaworthiness and negligence in the sum of $51,600, and upon his claim for maintenance in the sum of $5,840, or a total of $57,440.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law unless either party desires enumerated or additional findings, which may be proposed upon five day's notice to the other party.