Eladio QUILES, Plaintiff,

v.

The CITY OF NEW YORK, Defendant/Third–Party Plaintiff,

v.

Moose Boat International, Third–Party Defendant.

No. 11 CIV. 5613(FM).

United States District Court, S.D. New York.

Oct. 23, 2013.

John Paton James, Bernard D. Friedman, Friedman, James & Buchsbaum LLP, New York, NY, for Plaintiff.

Monica Kelly, New York City Law Department, New York, NY, Thomas Michael Hoey, Jr., Corporation Counsel, Yonkers, NY, for Defendant/Third–Party Plaintiff.

Carl Anthony Formicola, Lewis, Johs, Avallone & Aviles, LLP, New York, NY, for Third–Party Defendant.

## MEMORANDUM DECISION

FRANK MAAS, United States Magistrate Judge.

Plaintiff Eladio Quiles ("Quiles"), a former New York City Police Department ("NYPD") officer assigned to the Harbor Unit was injured on October 8, 2008, while attempting to disembark from a "Moose Boat" that the NYPD was testing. In this personal injury action brought pursuant to the Jones Act, 46 U.S.C. § 30104, Quiles claims that his employer, Defendant/Third–Party Plaintiff City of New York ("City"), was negligent in failing to provide a reasonably safe place to work. Quiles further alleges that the Moose Boat was unseaworthy. After Quiles served his complaint, the City filed a third-party complaint against the manufacturer of the vessel, Moose Boat Inc. ("MBI"),[1] seeking indemnification or contribution for any losses incurred by the City as a result of Quiles' claims.

The City has filed a motion for summary judgment seeking the dismissal of Quiles'

complaint on the grounds that: (1) he was not a "seaman" within the meaning of the Jones Act at the time of his injury; (2) the City was not negligent; and (3) the Moose Boat was seaworthy. In addition, MBI has moved for summary judgment against the City arguing that the third-party complaint should be dismissed because: (1) Quiles' inability to sue MBI directly under the Jones Act precludes the City from seeking to recover from MBI based on Quiles' claim; (2) MBI did not have control of the Moose Boat on the date of Quiles' injury and, thus, cannot be held liable; and (3) the Moose Boat was seaworthy.

For the reasons set forth below, the City's motion (ECF No. 29) is denied, as is MBI's motion (ECF No. 25).

### I. Factual Background

Unless otherwise noted, the following facts are undisputed:

Quiles joined the NYPD in October 1990. (ECF No. 31 (Affirm. of Ass't Corp. Counsel Thomas M. Hoey, dated Feb. 19, 2013 ("Hoey Affirm.")), Ex. B ("Quiles Dep.") at 14, 25–26). In 2003 the NYPD reassigned Quiles to the Harbor Unit where he served as a deckhand. (Id. at 29–34). This position required that he go through one month of training at the Harbor Charlie station house in Brooklyn. (Id. at 29–30, 32–34). As a deckhand, his responsibilities included cleaning boats, moving equipment, and throwing lines. (Id. at 34). He was instructed to use dock staircases when entering vessels, and to exit vessels "safely and carefully." (Id. at 34). In particular, he was told to step onto the staircase and then onto the dock when exiting a 30–foot launch. (Id. at 35). When a 30–foot launch docked at a location

---

1. The City sued MBI as "Moose Boat International." It appears undisputed that the correct name of the company is Moose Boat, Inc.

Accordingly, the caption of this action will be amended to so reflect.

without a staircase, however, it was "common practice" to alight by jumping from the side of the boat onto the dock. (*Id.* at 37–38).

During his time with the Harbor Unit, Quiles was assigned to Harbor Charlie, although he at times would be sent to two other station houses, Harbor Adam and Harbor George. (*Id.* at 40). As a deckhand, "almost all of [his] time was spent piloting or crewing various police launches." (ECF No. 36 (Affirm. of John P. James, Esq., sworn to on Mar. 11, 2013 ("James Affirm.")), Ex. 1 ("Quiles Decl.") ¶ 4). The NYPD also trained Quiles as a navigator, engineer, and pilot. (Quiles Dep. 64–65).

In approximately 2008, the NYPD assigned Quiles to be the plant manager at Harbor Charlie. (*Id.* at 41–42). This position required him to maintain the interior of the station house. (*Id.* at 42–44). Once Quiles took over as plant manager, he no longer had any responsibility for maintenance of the vessels or docks. (*Id.* at 44). Instead, his responsibilities were "strictly within the walls of the station house at Harbor Charlie." (*Id.* at 44–45).[2] He was still assigned as plant manager on October 8, 2008, the date of his injury, and it had been a "couple of weeks" since he last had been on an NYPD vessel. (*Id.* at 45).

On October 8, a supervisor assigned Quiles to pilot a 30-foot NYPD launch from Harbor Charlie to the launch repair shop at Randall's Island. (*Id.* at 63–64). After he did so, Sergeant Thomas Horvath ("Horvath"), Sergeant (now Lieutenant) Joseph Grosso ("Grosso"), and a third Harbor Unit officer were to transport Quiles and a fellow officer, via the Moose Boat, from Randall's Island to Harbor

Charlie. (*Id.* at 64). The NYPD had obtained the Moose Boat from MBI approximately one week earlier and was using it to conduct sea trials. (*Id.* at 164).

When Quiles arrived at the launch repair shop, he stepped from the side of the launch onto the dock to tie it up. (*Id.* at 71–72). After he returned to the launch, the Moose Boat approached bow-to-bow so that he could transfer to it. He did so by first stepping over a three-inch metal lip on the hull of the 30-foot launch. (*Id.* at 75). He then stepped on to a rubber nonskid area on top of the Moose Boat gunwale and then onto its deck, one foot at a time. (*Id.* at 77, 83–84). He had no difficulty accomplishing this even though there was no handrail on the Moose Boat and no one had assisted him. (*Id.* at 82–83). The Moose Boat's gunwale was "much higher" above the water at both the bow and stern than the gunwales on the 30- and 36-foot launches to which Quiles was accustomed. (*Id.* at 68–69). This was Quiles' first time on the Moose Boat, and he had not received any training or written materials concerning its operation. (*Id.* at 67, 70).

Quiles and the other Harbor Unit officers then traveled via the Moose Boat to Harbor Charlie. (*Id.* at 79). Quiles had no specific assigned duties on the return trip, but nevertheless considered himself part of the crew. (*Id.* at 88; Quiles Decl. ¶ 12).

At Harbor Charlie, the Moose Boat pulled into a floating dock that lacked a staircase for disembarking. (Quiles Dep. 89). Although some of the other docks at Harbor Charlie were equipped with steps, the crew docked the Moose Boat at that floating dock because "the marina was

---

2. Quiles has submitted a declaration stating that, as plant manager, he "continued to operate and/or crew various harbor unit launches," and that he still spent "approxi- mately 40% of [his] time … aboard Harbor Unit launches as a crew member." (Quiles Decl. ¶¶ 6–7; *see* Hoey Affirm. Ex. C ("Horvath Dep.") at 81).

pretty much full." (*Id.* at 96). It was "fairly common" for a vessel to pull into a Harbor Charlie dock that lacked stairs. (*Id.* at 95–96). Nevertheless, Harbor Charlie was not equipped with any portable stairs, nor did it have a shore crew to help crew members on a vessel as they disembarked. (*Id.*).

Horvath and Grosso were the first to leave the Moose Boat. (Hoey Affirm., Ex. C ("Horvath Dep.") 33–34). Horvath did so by stepping on the gunwale and jumping onto the dock. (Quiles Dep. 90). Quiles was the third person to disembark from the Moose Boat. (*Id.*). He stepped onto the gunwale and stood on it with both feet facing the floating dock. There was nothing obstructing the space between his toes and the edge of the gunwale. (*Id.* at 91, 97). He then jumped from the gunwale, over the vessel's flotation collar or "bumper," [3] and landed on the floating dock. (*Id.* at 91, 98). As he landed on the dock, his left foot rolled over, injuring his left ankle, and he fell. (*Id.* at 91, 165).

As Quiles was alighting from the Moose Boat, the floating dock was moving from side to side and up and down due to the waves, but there was no liquid or other substance on it. Quiles never asked anyone for assistance or for a box or staircase, nor did he hold on to anything as he jumped down. (*Id.* at 91–92, 95, 164–65). Quiles had jumped from other vessels the same way, although those vessels had a cutout in the rubber molding that allowed someone to step right onto the dock, a feature the Moose Boat lacked. (*Id.* at 99). According to Quiles, on the Moose Boat, "there was no other way ... to get from the top of the gunwale down to ... the dock." (*Id.* at 169).

## II. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law" based on supporting materials in the record. Fed.R.Civ.P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences ... in favor of that party." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 78 (2d Cir.2002) (quoting *Gummo v. Vill. of Depew, N.Y.*, 75 F.3d 98, 107 (2d Cir. 1996)). To defeat a properly-supported motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the party opposing summary judgment must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see also FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010)

---

**3.** The flotation collar is intended to provide extra buoyancy when people are being rescued from the water or the vessel is encountering rough waves. At other times, the flotation collar is not in the water and is mounted alongside the gunwale. (Hoey Affirm. Ex. F ("Fisher Report") ¶¶ 5, 8 & Ex. 3).

(non-moving party cannot simply rely on "conclusory allegations or unsubstantiated speculation").

Assessments of credibility, choosing between "conflicting versions of the events," and "the weighing of evidence are matters for the jury, not for the [C]ourt." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997). Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Id.* at 55. At the same time, however, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996).

## III. *Discussion*

### A. *City's Motion*

■ Quiles seeks to recover damages from the City based on claims of negligence under the Jones Act and unseaworthiness under general maritime law. "In accordance with general tort principles a crew member seeking damages against his employer, ... either under the maritime doctrine of unseaworthiness or under the Jones Act, has the burden of proving that the ship was unseaworthy or the owner negligent and also that such unseaworthiness or negligence was in fact a cause of his injury." *In re Marine Sulphur Queen*, 460 F.2d 89, 99 (2d Cir.1972). In its summary judgment motion, the City contends that Quiles cannot do so because: (1) he was not a seaman within the meaning of Jones Act; (2) the City was not negligent; and (3) the Moose Boat was seaworthy. (ECF No. 32 ("City Mem.") at 1, 3–5). As set forth below, because there are genuine issues of material fact regarding Quiles' claims, the City's motion for summary judgment must be denied.

### 1. *Jones Act*

■ The Jones Act provides that "[a] seaman injured in the course of employment ... may elect to bring a civil action at law, with the right of trial by jury, against the employer." 46 U.S.C. § 30104. To succeed under the Jones Act, "the plaintiff must prove by a preponderance of the evidence: '[a] that a dangerous condition actually existed; [b] that the defendant ... had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and [c] that if the [defendant] was negligent, such negligence proximately caused the plaintiff's injuries.' " *Bailey v. Seaboard Barge Corp.*, 385 F.Supp.2d 310, 315 (S.D.N.Y.2005) (quoting *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 58 (2d Cir.1986)). The Jones Act thus permits a maritime worker to bring a federal negligence claim against his employer for injuries suffered on the job, provided the plaintiff is a "seaman." *Sologub v. City of N.Y.*, 202 F.3d 175, 178 (2d Cir.2000).

Because only a seaman may file a claim under the statute, the first issue presented by Quiles' Jones Act claim is whether he can be considered to have been a seaman on October 8, 2008, when he also was serving as the plant manager at Harbor Charlie. Before turning to that issue, however, the Court must resolve a threshold question: whether it may consider Quiles' post-deposition declaration in the course of ruling on the City's motion.

### a. *Admissibility of Quiles' Declaration*

■ The City asserts that, in ruling on its motion for summary judgment, the Court should disregard the declaration submitted by Quiles as part of his opposition to the City's motion. The City's first objection is that the declaration "does not

satisfy the requirement" of an affidavit and was not made under oath. (ECF No. 41 ("City Reply") at 3). The City is correct that the Quiles declaration is not in the form of an affidavit. Under 28 U.S.C. § 1746, however, an unsworn declaration is admissible to establish a fact, provided it is in writing, "subscribed . . . as true under penalty of perjury, and dated." *See Le-Boeuf, Lamb, Greene & MacRae, LLP v. Worsham*, 185 F.3d 61, 65–66 (2d Cir.1999) (letter that did not "contain the exact language of Section 1746" nevertheless "substantially complie[d]"). The Quiles declaration meets each of these requirements. Accordingly, the absence of a notarization is not a basis for the Court to refrain from considering Quiles' post-deposition statement.

■ The City argues further that the declaration should be ignored because it contradicts Quiles' prior sworn deposition testimony. (City Reply at 2–4). It is settled law in this Circuit that a party seeking to defeat a summary judgment motion may not "creat[e] material issues of fact by contradicting [his] prior deposition testimony." *Dollard v. Perry's Ice Cream Co.*, No. 99 Civ. 594E(F), 2001 WL 1117137, at *1 n. 1 (W.D.N.Y. Sept. 10, 2001) (citing *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991)). Nevertheless, a subsequent statement may be considered when, rather than contradicting the deposition, it merely "creates 'a genuine issue of material fact' by supplying additional information, particularly where the deponent's answers had not been clear or the questions posed to him had not been altogether unambiguous." *United States v. Krieger*, 773 F.Supp. 580, 587 (S.D.N.Y.1991) (citing *Villante v. Dep't of Corr.*, 786 F.2d 516, 522 (2d Cir.1986); *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir.1986); *Miller v. A.H. Robins Co.*, 766 F.2d 1102,

1104 (7th Cir.1985); *Bender v. Southland Corp.*, 749 F.2d 1205, 1211 (6th Cir.1984)).

■ During his deposition, Quiles testified that, once he took over as plant manager at Harbor Charlie, his *"responsibility was strictly within the walls of the station house at Harbor Charlie"* and he no longer had any *responsibility* for the *maintenance* of the vessels or the docks. (Quiles Dep. 44–45) (emphasis added). In the declaration submitted with his opposition papers, Quiles arguably altered the description of his duties as plant manager, stating that he "did not have any *specific* responsibility for maintenance of the vessels owned and/or operated by the Harbor Unit or maintenance of the docks/piers." (Quiles Decl. ¶ 6 (emphasis added)). Indeed, Quiles went on to state that, as plant manager, "approximately 40% of [his] time . . . was spent aboard Harbor Unit launches as a crew member." (*Id.* ¶ 7). This claim arguably is inconsistent with his prior deposition testimony that he had worked on vessels *prior* to being appointed plant manager. (Quiles Dep. 44–45). During his deposition, Quiles also testified that he had not been on a vessel for "a couple of weeks" on the day of his injury. (*Id.* at 45).

Despite these apparent contradictions, Quiles' deposition testimony and subsequent declaration can be reconciled. As noted, Quiles gave deposition testimony indicating that he had no responsibility for the *maintenance* of the vessels or docks. (Quiles Dep. 44–45). Quiles never was asked, however, whether his position as plant manager entailed any *other* responsibilities regarding the vessels or docks. His declaration that he "continued to operate and/or crew various Harbor Unit launches," (Quiles Decl. ¶ 7), therefore is not necessarily inconsistent with his deposition testimony. *See Montefiore Medical Ctr. v. Am. Protection Ins. Co.*, 226

F.Supp.2d 470, 474 (S.D.N.Y.2002) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d at 619–20) ("While 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony,' here, the affidavit and the reports previously proffered 'are only arguably contradictory.' ").

Second, the concern that a "sham" affidavit might be interposed to preclude summary judgment is alleviated when there is other evidence supporting the affiant's subsequently-espoused version of reality. *Palazzo v. Corio*, 232 F.3d 38, 43–44 (2d Cir.2000). The fact that Quiles was assigned to pilot a vessel to the repair shop on the date of his injury is alone corroborative of his statement that he had some continuing responsibilities for Harbor Unit vessels even after he became the plant manager. Moreover, other NYPD personnel on the Moose Boat on the day of Quiles' injury have submitted declarations stating that Quiles was a member of the vessel's crew on that day. (*See* James Affirm. Ex. 2 (Decl. of Det. Vincent R. Mangiamele, sworn to on Mar. 1, 2013), ¶ 6 & Ex. 3 (Decl. of Det. Karl Zarr, sworn to on Mar. 7, 2013), ¶ 7).

In these circumstances, although Quiles' declaration is not wholly consistent with his deposition testimony, the Court cannot preclude it on the theory that the two cannot be reconciled. The credibility of Quiles' subsequent assertions regarding his duties is, instead, a question that the jury must resolve. I therefore will consider the declaration when addressing the issue of whether Quiles was a "seaman" on the date of his injury.

### b. *Quiles' Seaman Status Under the Jones Act*

Whether someone injured aboard a vessel is a "seaman" under the

Jones Act presents a mixed question of law and fact. *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). Unfortunately, the term "seaman" is not defined in the Jones Act. *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). Under the applicable case law, to qualify as a Jones Act seaman, a plaintiff need not be engaged in navigation or other "transportation-related functions" aboard a vessel. *Id.* at 350, 355, 357, 115 S.Ct. 2172. Nevertheless, the seaman must be "perform[ing] the work of a vessel." *Wilander*, 498 U.S. 337, 355, 111 S.Ct. 807 (1991). As the Supreme Court explained in *Chandris*, to be a seaman, a maritime worker thus must satisfy two requirements. 515 U.S. 347, 368, 115 S.Ct. 2172. First, the worker's "duties must contribute to the function of the vessel or to the accomplishment of its mission" because "[t]he Jones Act's protections . . . only extend to those maritime employees who do the ship's work." *Id.* (internal citations, editing, and quotation marks omitted). Second, the worker "must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and its nature." *Id.* Because of these status-based criteria, "[l]and-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore." *Id.* at 361, 115 S.Ct. 2172.

Recognizing that a "snapshot test" is inappropriate because "a more enduring relationship is contemplated," the *Chandris* court adopted a "rule of thumb"—first employed in the Fifth Circuit—pursuant to which a person is assumed not to be a Jones Act seaman if he spends less than thirty percent of his work

time aboard a ship. *Id.* at 363, 367, 371, 115 S.Ct. 2172. "If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a [seaman], it is a question for the jury." *Wilander*, 498 U.S. at 356, 111 S.Ct. 807. Thus, summary judgment is appropriate solely "where the facts and the law will reasonably support only one conclusion." *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 64 (2d Cir.2002) (quoting *Wilander*, 498 U.S. at 356, 111 S.Ct. 807).

 There is little question that Quiles would have been classified as a seaman had his injury occurred before he was assigned as the Harbor Charlie plant manager. Indeed, for more than four years, beginning in June 2003, Quiles' "primary role" as a member of the NYPD Harbor Unit was to "operate and/or crew various vessels owned and/or operated by the Harbor Unit" and "almost all of [his] time was spent piloting or crewing various police launches." (Quiles Decl. ¶¶ 2–4). The fact that Quiles may have been on vessels throughout his employment as a deckhand, however, is not determinative of whether he was a seaman on the day of his injury. Stated somewhat differently, the *Chandris* rule is not applied by averaging an employee's time aboard vessels over an extended time period. *See Chandris*, 515 U.S. at 363, 372, 115 S.Ct. 2172 (Although "a worker may not oscillate back and forth between Jones Act coverage and other remedies depending on the activity in which the worker was engaged while injured," "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well.").

The fact that Quiles' title at the time of his injury was "plant manager" is not dispositive of his eligibility to invoke the Jones Act against the City. Indeed, according to Quiles, even when he became the plant manager, he "continued to operate and/or crew various Harbor Unit launches," and "40% of [his] time … was spent aboard Harbor Unit launches as a crew member." (Quiles Decl. ¶ 7). While Quiles' deposition testimony renders the latter representation somewhat suspect, there is no question that he was assigned to pilot a 30–foot launch from Harbor Charlie to the Randall's Island repair shop for service on the date of his injury. (Quiles Dep. 63–64; Quiles Decl. ¶ 9). Additionally, Quiles has stated that his tasks as plant manager included filling in for other officers and "constant transportation of launches to the Harbor Unit's Launch Repair Shop for necessary maintenance and repair." (Quiles Decl. ¶ 8). During his deposition, Horvath also confirmed that, even when Quiles was the plant manager, he "had occasion to go aboard vessels and operate in the waters around New York harbor." (Horvath Dep. 81). Although Horvath did not state how often those occasions arose, based on this amalgam of facts, a reasonable juror could conclude that, despite Quiles' "plant manager" title, he was a seaman on October 8, 2008.

Accordingly, because there is a factual issue concerning Quiles' seaman status on the date of his injury, the City's motion for summary judgment on this issue must be denied.

### c. *Negligence Under Jones Act*

 Because there is sufficient evidence for a jury to find that Quiles was a seaman on the date he was injured, to proceed with his Jones Act claim Quiles need only show: "[i] that a dangerous condition actually existed on the ship; [ii] that the [City] had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and [iii] that if the [City] was negligent, such negligence proximately caused [his] injuries." *Diebold*, 805 F.2d at 58. In keeping with the remedial purposes of the

Jones Act, the standard that a plaintiff must meet to establish negligence is relatively low. "A plaintiff is entitled to go to the jury if the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury ... for which damages are sought." *Id.* at 57–58 (emphasis in original) (internal citations and quotation marks omitted). Here, Quiles has presented evidence that the City was negligent and that he suffered injury as a result sufficient to defeat the City's summary judgment motion.

Quiles testified that he generally disembarked from NYPD vessels by passing through a cut-out door on the vessels' sides, but that the Moose Boat did not have such an opening. (Quiles Dep. 99). Furthermore, Quiles' expert, Dr. Kenneth Fisher, stated in his report that the only way for Quiles to exit the Moose Boat was to cross a 23–inch high and 19–inch wide barrier created by the gunwale and flotation collar. (Hoey Affirm. Ex. F ("Fisher Report") ¶¶ 8, 11–13, 24). According to Dr. Fisher, the dangers caused by this "easily identifiable hazard" could have been ameliorated in a number of ways. (*Id.* ¶¶ 25, 27). Specifically, the vessel could have been equipped with more railings on the side, a portable stairway or ramp could have been kept on the dock, or the flotation collar and gunwale of the vessel could have had the cutout common on other vessels. (*Id.* ¶¶ 15, 20–23, 27–28; *see* Quiles Dep. 99). In Dr. Fisher's opinion, the absence of any of these safety measures rendered the Moose Boat out of

compliance with industry custom and practice—a conclusion he says is bolstered by applicable Coast Guard recommendations and OSHA requirements. (Fisher Report ¶¶ 26–29).

Perhaps not surprisingly, the City's own maritime expert, Dr. Richard Dein, disagrees with Dr. Fisher's conclusions, stating that there is "no evidence to suggest [that the Moose Boat] was unseaworthy" or that "the absence of a staircase constitute[d] an unreasonably unsafe condition." (*See* ECF No. 26 (Affirm. of Carl A. Formicola, Esq., sworn to on Feb. 15, 2013 ("Formicola Affirm.")), Ex. F ("Dein Report") at 5–6).

 "Summary judgment is not favored in cases involving materially conflicting expert reports." *Cohalan v. Genie Indus., Inc.*, No. 10 Civ. 2415(JMF), 2013 WL 829150, at *6 (S.D.N.Y. Mar. 1, 2013) (internal citations and quotations omitted). Here, the City has not interposed a *Daubert* challenge to Dr. Fisher's report. *See Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, Quiles' testimony and the report of his expert, Dr. Fisher, plainly suffice to create a material factual issue as to whether the City negligently created a situation in which Quiles had to disembark over a large flotation collar without the benefit of adequate railings, a cutout in the gunwale or collar, or a staircase. The City's motion for summary judgment with respect to Quiles' Jones Act claim consequently must be denied.[4]

---

4. In its motion papers, the City further contends that Quiles' own failure to exercise ordinary care by "leaping from the top of the gunwale" was the cause of his injury. (City Mem. at 5). Although Quiles' method of disembarking from the Moose Boat may have contributed to his injury, the role of any comparative negligence on his part is a question for the jury. *See, e.g., Juliussen v. Buchanan Marine, L.P.*, No. 08 Civ. 1463(DCP), 2010 WL 86936, at *9 (S.D.N.Y. Jan. 7, 2010) (quoting *Diebold*, 805 F.2d at 58) (The "low and liberal standard" of proof in Jones Act cases, "combined with the applicable principle of comparative negligence that does not bar recovery on grounds of contributory negligence or assumption of risk by the plaintiff in Jones Act cases[,] ... works in favor of

## 2. *Unseaworthiness*

■ As the Supreme Court has noted, "liability based upon unseaworthiness is wholly distinct from liability based upon negligence." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). Indeed, "unseaworthiness is a condition, and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." *Id.* Nonetheless, despite their conceptual separateness, both theories of recovery often "depend in large part upon the same evidence, and involve some identical elements of recovery." *See Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 18, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963).

■ "Under the principles of seaworthiness, an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service." *Oxley v. City of N.Y.*, 923 F.2d 22, 24 (2d Cir.1991) (citing *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Martinez v. United States*, 705 F.2d 658, 660 (2d Cir.1983)). Thus, a vessel is "considered unseaworthy if it lacks a safe place of ingress and egress." *Id.* at 26 (citing *Buch v. United States*, 122 F.Supp. 25, 26 (S.D.N.Y.1954)). Further, the ship owner is liable for injury to a member of the crew caused by an "insufficiently or defectively equipped" ship, regardless of negligence or fault. *Id.* at 25 (quoting *Waldron v. Moore–McCormack Lines, Inc.*, 386 U.S. 724, 726, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967)). Whether a vessel is unseaworthy, and whether an unseaworthy condition proximately caused a plaintiff's injury, generally are questions of fact for the jury. *See id.*

at 26 (quoting *Johannessen v. Gulf Trading & Transp. Co.*, 633 F.2d 653, 656–57 (2d Cir.1980)) ("This fact-finding process was for the jury.").

■ The evidence submitted by Quiles to support his claim that the City was negligent also would permit a reasonable juror to find that the Moose Boat did not have a safe means of egress and, therefore, was unseaworthy. As noted previously, Quiles testified that he was accustomed to disembarking from other Harbor Unit vessels via a cutout that allowed him to step directly onto the dock without needing to cross the top of a flotation collar. It is undisputed that the Moose Boat lacked such a cutout. (Quiles Dep. 99). In his expert report, Dr. Fisher noted that the high gunwale and gap created by the flotation collar prevented Quiles from disembarking safely from the vessel. (Fisher Report ¶¶ 8, 11–13, 24–25). According to Dr. Fisher, had the City complied with standard industry custom and practice by installing a cutout in the collar and gunwale of the Moose Boat or having portable steps on the dock, Quiles could have disembarked without risking an injury. (*See id.* ¶¶ 26–29).

The City correctly asserts that an "employer is not required to provide an accident-proof vessel in order for it to be seaworthy." (City Mem. at 4). Quiles, however, does not contend that the City was obligated to provide an "accident-proof vessel," but, rather, that the vessel had to be "reasonably fit for [its] intended service" and have a "safe place of ingress and egress." *Oxley*, 923 F.2d at 24, 26. The fact that two other employees left the vessel safely before Quiles attempted to do so suggests that the vessel may have met

submission of issues to the jury."); *Johnson v. Horizon Lines, LLC*, 520 F.Supp.2d 524, 533 (S.D.N.Y.2007) ("[Q]uestions of defendant's negligence, plaintiff's contributory negligence, causation, and damages are for the jury.").

this standard. On the other hand, the fact that the collar made it more difficult to alight, combined with Dr. Fisher's observations, would permit the jury to find to the contrary. Determining which side has the better of this argument consequently is a jury question that cannot be resolved by a summary judgment motion.

### B. *MBI's Motion*

MBI has moved for summary judgment with respect to the City's third-party complaint.[5] In its motion, MBI contends that: (1) the City cannot maintain a third-party action against MBI because a Jones Act claim requires an employer-employee relationship and no such relationship existed between Quiles and MBI; (2) the City was the owner *pro hac vice* of the Moose Boat on the date of Quiles' injury because it "was in sole and exclusive control of the vessel;" and (3) there is no evidence that the Moose Boat was unseaworthy. (ECF No. 27 ("MBI Mem."); ECF No. 39 ("MBI Reply")). None of these arguments warrants summary judgment in MBI's favor.

#### 1. *Right to Bring a Third–Party Action*

 MBI first contends that the City cannot maintain its third-party action because any liability on the part of the City would arise under the Jones Act, a statute that requires an employer-employee rela-

tionship between the plaintiff and defendant. (MBI Mem. at 3). MBI reasons that because MBI could not be sued directly under the Jones Act, any claims in the City's third-party complaint "which in any way derive from the provisions of the Jones Act must be dismissed with prejudice." (*Id.* at 3). MBI cites no authority to support this proposition, nor does there appear to be any.

The Jones Act, of course, permits a seaman to sue only his employer. 46 U.S.C. § 30104. Although it is clear that the City is not a seaman and MBI is not an employer, nothing in the rather terse language of the Jones Act[6] precludes a claim by the City against MBI on a different theory. Indeed, in *Dunbar v. Henry DuBois' Sons Co.*, 275 F.2d 304 (2d Cir.1960), the Second Circuit expressly sanctioned the pursuit of an indemnity claim by a seaman's employer against a third party. That case arose out of the death of a seaman after a moveable derrick owned by his employer capsized and caused him to drown. Reversing the district court's dismissal of the third-party complaint, the Second Circuit held that an unrelated company that had been towing the derrick could be named in a third-party complaint seeking indemnity on the theory that "the unseaworthy condition of the [derrick] which led to [the seaman's] death was brought into play by

---

5. The Court has pendent jurisdiction over the City's contribution and indemnification claims against MBI because those claims share a "common nucleus of operative fact" with Quiles' claims against the City. *See Compl. of Poling Transp. Corp.*, 776 F.Supp. 779, 781 (S.D.N.Y.1991) (finding pendent jurisdiction over common law claims, in part, because "common law claims for … indemnification and/or contribution arise from a 'common nucleus of operative fact' " (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966))); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 380, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) ("the [d]istrict [c]ourt may have juris-

diction of [general maritime law claims] 'pendent' to its jurisdiction under the Jones Act").

6. The operative language of the statute, in its entirety, is as follows:

 A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

 46 U.S.C. § 30104.

the negligent manner in which the tug ... performed its towing operation." *Id.* at 307.

Similarly, in *O'Neill v. Am. Export Lines, Inc.*, 5 F.R.D. 182 (S.D.N.Y.1946), an earlier case presenting facts not unlike this one, the seaman sued his employer, the owner of a vessel, under the Jones Act after he was "injured through the breaking of a ladder which was part of the ship's equipment." *Id.* at 183. The Court denied the ladder supplier's motion to dismiss a third-party complaint against it by the vessel owner, noting that the "fact that the suit is originally under the Jones Act and that different defenses may be available to the various parties is no ground for objection to being impleaded." *Id.*

In this case, as in *Dunbar* and *O'Neill*, neither Quiles nor his employer seek to recover monetary damages against a third-party defendant under the Jones Act. Rather, Quiles has sued only the City. Moreover, the City's claim against MBI proceeds on the theory that if the City is found liable, MBI will be "lawfully bound to indemnify [it]." (ECF No. 10 ¶ 8). An indemnification claim differs from a Jones Act claim. Consequently, the City's third-party indemnification or contribution action is not subject to dismissal merely because the Plaintiff's original claims against the City arise under the Act.

Indeed, the fact that only a seaman's employer may be named as the defendant in a Jones Act claim would not have precluded Quiles from proceeding directly against MBI under a separate theory of relief, such as products liability. *See McIsaac v. Didriksen Fishing Corp.*, 809 F.2d 129, 131–32 (1st Cir.1987) (manufacturer of helmsman's chair found liable to seaman for negligent design and failure to warn). Nor does it mean that Quiles would be unable to recover from the City under a theory of liability not requiring an employer-employee relationship, such as unseaworthiness. *See Karvelis v. Constellation Lines S.A.*, 806 F.2d 49, 51–52 (2d Cir.1986) (allowing both unseaworthiness and Jones Act claims to proceed against vessel-operator employer).

Finally, notwithstanding MBI's argument to the contrary, (*see* MBI Mem. at 5), the mere fact that the agreement between MBI and the City for the field test of the Moose Boat may have contained no language regarding indemnification or contribution is not a basis for dismissal of the City's third-party claim. Indeed, in a maritime case, a party may be able to pursue such a claim as a matter of common law. *See, e.g., Miller v. Am. President Lines, Ltd.*, 989 F.2d 1450, 1460–63 (6th Cir.1993) (rejecting rule that an active tortfeasor may not seek indemnity and permitting third-party claim by Jones Act defendant to proceed on a "noncontractual indemnity" theory); *Vaughn v. Farrell Lines, Inc.*, 937 F.2d 953, 956–57 (4th Cir.1991) (recognizing right to noncontractual indemnity in suit brought against product manufacturer by shipowners who had settled seaman's Jones Act and unseaworthiness claims); *The William C. Atwater*, 110 F.2d 644, 646 (2d Cir.1940) ("Contribution is an equitable right ... allowable between joint tort feasors ... in admiralty.").

In sum, MBI's arguments that Quiles' claim against the City under the Jones Act precludes the City's own third-party claim against MBI are without merit.

### 2. *Control Over Moose Boat and Unseaworthiness*

MBI also contends that it is entitled to summary judgment because it relinquished complete control over the Moose Boat during the period that it was being used by the NYPD for the sea trial, thereby making the NYPD the vessel's owner *pro hac vice.* (MBI Mem. at 4). This argument

fails for at least two reasons. First, even if the NYPD were the owner *pro hac vice,* MBI has not shown, as it must, that *only* the NYPD can be considered the owner of the Moose Boat on the date of Quiles' injury. Second, even if MBI were able to make that showing, it still would not preclude the City's third-party claim because the alleged defect arose prior to the transfer of ownership.

For a demisee to be considered an owner *pro hac vice,* and thus face potential liability for injury caused by a vessel's unseaworthiness, the "owner of the vessel must completely and exclusively relinquish possession, command, and navigation thereof to the demisee." *Fitzgerald v. A.L. Burbank & Co.,* 451 F.2d 670, 676 (2d Cir.1971) (internal citations and quotations omitted). The arrangement consequently must be "tantamount to, though just short of, an outright transfer of ownership." *Id.* (quoting *Guzman v. Pichirilo,* 369 U.S. 698, 699–700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962)). This commonly arises in situations involving a "demise or bareboat charter." *Id.* Importantly, however, because "courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship," *Guzman,* 369 U.S. at 700, 82 S.Ct. 1095, there is a general presumption that the owner of a vessel maintains possession and does not intend to surrender control. *Fitzgerald,* 451 F.2d at 676. Thus, the owner bears the burden of establishing that it has relinquished possession and control and is "relieved of the legal obligations flowing to [it] as owner." *Id.* (citing *Guzman,* 369 U.S. at 700, 82 S.Ct. 1095).

In this case, MBI tendered the Moose Boat to the City pursuant to a one-page letter agreement notable for its brevity. (Formicola Affirm., Ex. E). In that document, MBI and the NYPD agreed that the "Field Test and Sea Trial" of the Moose Boat was being conducted solely so that the NYPD could "learn[ ] about the products and/or services offered by [MBI]." (*Id.*) Furthermore, MBI agreed that the City and the NYPD "shall not be liable for any damages to [MBI's] products (sic) that may occur during a demonstration and field test, including field tests that [MBI] authorize[d] to take place without [its] presence, or while the product is in the possession of the NYPD for a demonstration period" of approximately three weeks. (*Id.*) In short, the NYPD and MBI agreed that the Harbor Unit would take the Moose Boat for a test drive—albeit an extended one—before deciding whether to purchase such a vessel. Given these circumstances, MBI cannot reasonably be deemed to have relinquished ownership, any more than a car dealer does by tendering the keys to a demonstrator vehicle to a prospective customer.

In any event, even if the Court were to assume that MBI relinquished full possession and control of the Moose Boat to the NYPD during the relevant period, thereby making the City the owner of the vessel *pro hac vice,* MBI still would not be entitled to summary judgment. Although a demise charterer, as the owner *pro hac vice,* generally is liable for a vessel's unseaworthiness, there is an exception when a plaintiff's "injury results from unseaworthiness or negligence which existed prior to the delivery of the vessel to the demise charterer." *In re Marine Sulphur Queen,* 460 F.2d 89, 100 (2d Cir.1972). As the Second Circuit noted in *Cannella v. Lykes Bros. S.S. Co.,*

> if the demisee has become liable to a third person because of an unseaworthiness existing at the time of the demise, the demisee may recover from the owner on the owner's warranty, whether the demisee is liable under his own warranty of seaworthiness, or under an imposed

liability such as that to a longshoreman. *Thus the ultimate liability rests upon the owner for any loss or injury occasioned by the ship's unseaworthiness at the time of delivery.* 174 F.2d 794, 796 (2d Cir.1949) (emphasis added).

To be sure, if Quiles had claimed that the Moose Boat was unseaworthy because the officers on the vessel were not trained properly, MBI might be entitled to summary judgment on the theory that it cannot be liable for the City's failure to train the crew. *See In re Marine Sulphur Queen,* 460 F.2d at 100 ("the demise charterer . . . is the owner *pro hac vice* with all the responsibilities to the crew otherwise placed upon the shipowner"). Here, however, Quiles alleges that the Moose Boat was unseaworthy because it lacked a safe means of egress. With respect to this issue, a reasonable juror could find that:

 a. the Moose Boat was unseaworthy because the City failed to provide Quiles with the necessary steps and railing at Harbor Charlie; or

 b. the Moose Boat was unseaworthy due to the lack of a cutout in the flotation collar and gunwale; or

 c. both conditions rendered the Moose Boat unseaworthy.

While the first alternative plainly would not expose MBI to liability, MBI could be found liable to indemnify the City under alternatives (b) or (c) because the lack of a cutout is a condition that "existed prior to the delivery of the vessel to the [City]." *See id.* Accordingly, even if MBI were able to show that the City had total control over the Moose Boat at the time of Quiles' injury, it still would not be entitled to summary judgment on the theory that the vessel was seaworthy.[7]

## IV. *Conclusion*

For the foregoing reasons, the City's motion for summary judgment, (ECF No.

---

7. In its opposition papers, the City advances several other theories of indemnification that merit brief discussion. First, the City contends that MBI breached its implied warranties of fitness under the Uniform Commercial Code ("Code") (*see* Code §§ 2–314 and 2–315) and workmanlike performance. (*See* ECF No. 37 ("City Opp. Mem.") at 3–4). Second, the City invokes the doctrine of strict products liability. (*Id.* at 4).

The City has not demonstrated a basis for invoking either species of implied warranty as a ground for indemnification. Article 2 of the Code is inapplicable as it concerns only sales of goods, and the loan of the vessel for sea trial purposes was not a sale. *See, e.g., Merrill Lynch Intern. v. XL Capital Assur., Inc.,* 564 F.Supp.2d 298, 303 n. 3 (S.D.N.Y.2008) ("Article 2 . . . applies only to contracts for the sale of goods."). The implied warranty of workmanlike performance also is inapposite as it generally is implied only in maritime *service* contracts. *See, e.g., Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); *Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.,* 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); *Saks Intern., Inc. v. M/V Export Champion,* 817 F.2d 1011 (2d Cir.1987); *Muller Boat Works, Inc. v. Unnamed 52' House Barge,* 464 F.Supp.2d 127 (E.D.N.Y.2006). Here, in making the loan, MBI did not undertake to provide any services.

The City may, however, be entitled to indemnification based on a theory of strict products liability. Claiming that a vessel is unseaworthy often is tantamount to claiming that it suffers from a defective design. *See Anastasiou v. M/T World Trust,* 338 F.Supp.2d 406, 418 (E.D.N.Y.2004). Because a reasonable juror could conclude that the lack of a cutout in the Moose Boat rendered it unseaworthy and led to Quiles' injury, MBI could also be found liable on a claim of strict products liability. *See Boyett v. Keene Corp.,* 815 F.Supp. 204, 211 (E.D.Tex.1993) ("[W]here a ship is found unseaworthy *solely* because of the presence of a defective product, and not because of any negligence on the part of the shipowner, the manufacturer should bear the loss."). MBI's efforts to deflect such a claim consequently are unavailing.

29), is denied, as is MBI's motion for summary judgment, (ECF No. 25).

Additionally, the caption of this action shall be amended to reflect the correct name of MBI, which is Moose Boat, Inc.

A further pretrial conference shall be held on November 12, 2013, at 11:00 a.m., in Courtroom 20A of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York. Trial is tentatively scheduled to commence on December 10, 2013.

SO ORDERED.